HUNTINGTON v. UNITED STATES. TODD v. SAME. HOYT v. SAME.†

(Circuit Court of Appeals, Eighth Circuit. December 3, 1909.)

Nos. 2,714-2,716.

1. CRIMINAL LAW (§ 670*) —TRIAL—RECEPTION OF EVIDENCE.

It is not the duty of the court in a criminal case to separate admissible from inadmissible evidence when embraced in a single offer, and where a document not objected to was joined in an offer with one objected to and inadmissible the court was justified in excluding both.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1595; Dec. Dig. § 670.*]

2. CRIMINAL LAW (§ 364*) —EVIDENCE—RES GESTÆ.

On the trial of a defendant charged with conspiracy to procure fraudulent homestead entries of public lands, testimony that defendant correctly explained the requirements of the homestead law as to residence, etc., to persons who were not mentioned in the indictment or the government's evidence as having any connection with the offense charged was irrelevant, and not admissible as part of the res gestæ.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 364.*]

Philips, District Judge, dissenting.

In Error to the District Court of the United States for the District of Nebraska.

Thomas M. Huntington, Ami B. Todd, and Fred Hoyt were each convicted of conspiracy, and each brings error. Affirmed.

See, also, 149 Fed. 443.

W. F. Gurley and J. W. Woodrough (D. O. Dwyer, on the brief), for plaintiffs in error.

S. R. Rush and Charles A. Goss, for the United States.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

HOOK, Circuit Judge. Thomas M. Huntington, Ami B. Todd, and Fred Hoyt were convicted of conspiracy to defraud the United States of the title, possession, and use of public lands in Nebraska by means of "false, feigned, fraudulent, untrue, illegal, and fictitious entries" under the homestead laws, and to commit the offense of suborning perjury. They were indicted jointly with Bartlett Richards and others, whose writs of error have just been disposed of (175 Fed. 911), but had a separate trial. So far as they require consideration, the objections of the present defendants to the indictment are answered by the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied April 15, 1910.

references in the opinion in the other case, and they need not be repeated. That opinion may also be consulted for a description of the character of the case against them.

Irving D. Hull, who was charged as a party to the conspiracy, testified for the government that he had been engaged by Huntington to get men who had had long service in the army of the United States to go to Nebraska and make homestead entries on public lands subject to the Kinkaid act (Act April 28, 1904, c. 1801, 33 Stat. 547 [U. S. Comp. St. Supp. 1909, p. 543]), and that Huntington said they could "prove up" by merely visiting the lands every six months. Hull accordingly made the same representations to those he induced to make the entries, but they took the oaths regarding settlement, residence, and cultivation necessary in case of homestead entries. One of the entrymen also testified Huntington said the same to him. To rebut this feature of the government's case defendants offered in evidence a letter to Huntington from one Uriah Clark, stating he had been informed that visits at six months intervals were sufficient, but that the oath he took indicated he must make his home on the land, and asking Huntington's advice how to hold the land without living on it. They also offered a press copy of Huntington's reply to Clark, in which he properly explained the requirements of the law. Counsel for the government said there was no objection to the letter written by Clark, but that they objected to the press copy of the reply, because sufficient foundation had not been shown for the introduction of such secondary evidence. The two papers were joined in one offer. They were not offered separately. The trial court excluded them, and complaint is made of the ruling. We think the court was right. The reasons given for Clark's failure to attend the trial and for the nonproduction of the original reply of Huntington were mere hearsay, nor was sufficient diligence shown in the premises. The duty of segregation and selection of admissible from inadmissible evidence offered together cannot be imposed on a court, and, though no objection was made to the letter of Clark, that which was joined with it in the offer justified the rejection of both. It may also be observed in this connection that, aside from the bare unsworn statements in Clark's letter, it did not appear that he ever had any connection whatever with any of the transactions involved in the case, or had ever entered or tried to enter any lands in Nebraska. Stripped of incompetent support, the evidence offered was in the nature of self-serving declarations of the defendant Huntington.

It is also urged by defendants that the court erred in excluding testimony of their witness McDowell. He testified that in October, 1904, he was present at a conversation in Merriman, Neb., between Huntington and three old soldiers, Smith, Gard, and Van Slike. The court denied defendants' offer to prove by McDowell that Huntington correctly explained to them the requirements of the law as to residence on lands entered as a homestead and read in full to them a form of homestead affidavit. This is claimed to be admissible as part of the res gestæ. The rule is that circumstances, acts, and declarations, which are so interwoven or connected with a transaction which is the subject of judicial inquiry as to be necessary to a just understanding of

it, should be received in evidence; but they should appear to be its undesigned accompaniments, free from any calculating purpose of those concerned. In other words, they should fit and have an immediate and natural relation to the principal fact. But no act with which the three soldiers had to do was charged in the indictment as an overt act, there was no mention of them in the various counts, nor did the government introduce evidence of any transaction in which they participated, similar to those related in the indictment, for the purpose of showing the intent of defendants in their conduct charged as being contrary to law, nor evidence that defendants or any one for them solicited or procured those soldiers to make fraudulent or illegal homestead entries, or misrepresented to them the requirements of the law. It did not appear that in fact they made entries. There was only casual and incidental mention of them in the evidence. It is suggested they belonged to one of Irving D. Hull's parties, but this was not shown. Hull did not mention them, nor did the defendant Huntington, whose testimony preceded that of the witness McDowell. The statements imputed to Huntington did not accompany or illustrate any act involved in the case, but appeared to have been voluntarily made to strangers to the record. Again, Huntington had already testified that his interest in the transactions in question was in the sale of leases obtained from the entrymen; so it is manifest such an interest might be subserved by encouraging some to make entries and by discouraging others. He was not engaged in the business without hope of compensation or reward for his labors and expenditures, and whether he would likely receive it in a particular case would depend upon the attitude of the prospective entryman. If the entryman was undesirable, there was no inducement to do otherwise than tell him what the law required in the way of settlement, residence, and improvement, and there was quite a general accord that the truth was a sufficient discouragement.

The sufficiency of the evidence was challenged by a request for a directed verdict, which the court denied. No useful purpose will be served by setting forth the details of the evidence. That for the government was along the lines indicated in the opinion in the other case, and, though the defendants here testified in their own behalf and offered additional proof, the verdict of the jury had substantial support.

The judgment is affirmed.

PHILIPS, District Judge (dissenting). Viewing this in connection with that of the preceding case of Richards v. United States, 175 Fed. 911, the conviction of this group of defendants, on the necessary theory that they intended by what they did to acquire the title to the lands, is more indefensible than the former convictions. The inculpation of Huntington, the representative of this group, depended mainly upon the testimony of the witnesses James and I. D. Hull. The theory of the government was that the Hulls, in procuring old soldiers to make entries under the homestead act, were acting under authority from Huntington, and that they represented to said entrymen, at the instance of Huntington, that the government did not require them to live upon the lands they might enter, and that the re-

quirements of the law would be satisfied should they visit the lands every six months. The substance of Hull's testimony was that Huntington wanted him to obtain declaratory statements from old soldiers to file on the land; that he wanted as many declaratory statements as he could get before the date the Kinkaid law went into effect. Hull further testified that Huntington told him that a soldier could prove up by visiting his land every six months, and that the soldiers he took out to Nebraska during the years 1904 and 1905, under the arrangement with Huntington, were so advised; he paying the expenses of the parties.

A number of said witnesses were called for the government. One of them, named Edwards, living at Logan, Iowa, who was acquainted with I. D. Hull, and knew him in the army, testified that he had a conversation with him in 1904 relative to entering a homestead in the fall of that year; Hull stated that he could go into Cherry county, Neb., and file on a section of land, and by going there every six months for a few days, he could finally prove up without living continuously on the land, and that his expenses would be paid; that after signing a declaratory statement, he went from Logan, Iowa, in company with a number of others, to Gordon; that in said company were the two Millimans, from Logan, and others; that they left Logan about the 5th or 6th of October. A number of other witnesses from Iowa testified that they made their declaratory statements and filings under the same circumstances. One of these witnesses testified that he had a conversation with Jim Hull, who wanted him and other old soldiers to go out to Nebraska and take a homestead under the Kinkaid act.

"He said we could get a section of land, and only have to go out once every six months on the land. He told me that there were lots of them going out, and our expenses would be paid. I filed a soldier's declaratory statement in Iowa, and went out in July, 1904. I think there were eight of us. When we got to Gordon, I saw Huntington, the defendant, but did not have any conversation with him."

He was then asked to state what the old soldiers said to Huntington, and what they said to him. His answer was "that he couldn't tell very much." He then named the soldiers that were in the party, which is important, as it tends to identify the other soldiers who were present as being the ones by whom a certain statement referred to in the majority opinion made by Huntington was sought to be placed in evidence. Others of these soldiers introduced by the government testified to the presence of certain soldiers at the time and place of said conversation, which tended to identify the time and place as that in question. Huntington testified on the trial of this case to the effect that he had never at any time stated to any entrymen that he did not have to live upon his land; that he was well acquainted with the law requiring bona fide residence, and whenever inquired of he stated the requirements of the law as to residence. In this condition of the case counsel for Huntington, after showing by Huntington that he received it, offered in evidence the following letter written to him by one of the soldiers residing at the town of Woodbine, Iowa, where Hull was procuring entrymen as aforesaid.

"Woodbine, Ia., Aug. 25, 1904.

"Thos. M. Huntington, Gordon, Neb.—Dear Sir: I received your letter of 22d yesterday and hesitated to answer, for fear you might get into a lawsuit in contesting this matter, but in carefully looking the papers over I have concluded to sign and forward to you. Now you said you would let me know how it came out. How long will it take to find out. Please let me know as soon as you find out. And now I want you to answer a few more questions. I was told before going up there that I did not have to live on the land, but only be on it every six months and that was all the law required. Now then the oath I take says I must live on the land and make it my home to hold it. Now Mr. I. D. Hull says there is a way to get around that, but don't tell how it is. Now what I want you to tell me is how I am going to hold that land without living on it, for I am never going to live on it. Please help me to see the way out and oblige.          Yours very truly,          Uriah Clark."

In answer to which Huntington wrote the following letter:

"August 27, 1904.

"Mr. Uriah Clark, Woodbine, Iowa—Dear Sir: I am in receipt of your letter of the 25th, with appeal signed and returned. You were misinformed when you were told that you did not have to live on your claim. It is supposed to become your residence after the first six months. Now a residence does not imply that you must be on the land every minute of the time, and absence for long periods for good causes will not impair your residence. But the government insists that it be your home from the end of the first six months until the time for final proof. The government looks at the intention of the homesteader, and will be more particular in regard to it than to the letter of the law. I know of cases where homesteaders became sick and were obliged to leave their claims for medical treatment. They were on their land hardly at all, yet for this cause they were allowed to make proof. My home is at Gordon, and I will soon have a homestead here. I shall live in Florida for three or four months every year, and be away from home a large part of the time otherwise; but these absences will not affect my rights to the homestead. I think that you will understand the matter now, and I am of the opinion that the government officers will be as lenient towards the old soldiers as it is possible for them to be.          Yours truly."

Huntington testified that he had tried to obtain the presence of said Clark by subpœna as a witness at the trial, but was advised that Clark was sick and unable to attend court; that Clark informed him he had lost or destroyed the letter received by him from Huntington. The said letter offered in evidence from Huntington to Clark was copied in Huntington's letter book kept by him, and, while this copy was unsigned by Huntington, he explained in his testimony that he did not sign the letter until after it was copied, and that the original sent by mail to Clark was signed by him. This letter appears in its regular order of date with other correspondence had and kept by Huntington. This correspondence was excluded by the court. The defendants also offered to show by Dr. McDowell that in October, 1904, he saw the defendant Huntington in his office with old soldiers named Smith, Gard, and Van Slike, to whom he was introduced, and that he heard a conversation between these soldiers (who were homestead entrymen) and Huntington, in which Huntington stated to them that they were required by law to live on their land continuously for five years, less the time of their military service, and that Huntington then and there read to these men the homestead affidavit and "the form of such affidavit." This evidence was excluded by the court, as indicated by

the interlocution, for the reason that they were not named in the indictment as entrymen and that it was mere hearsay.

Due consideration and investigation have fully satisfied my mind that said action of the court constitutes reversible error. In the consideration of this question it should be kept constantly in mind that the gist of the indictment is the existence of the imputed fraudulent purpose of Huntington in procuring old soldiers to make the declaratory statements and entries. It is a universally recognized rule of evidence that whenever it is material to prove the state of a person's mind, or what were his intentions, you may prove what he said, "because it is the only means by which you can find out what his intentions are." This rule is stated by Mellish, L. J., in Sugden v. St. Leonards, L. R. 1 P. D. 154, as follows:

"Wherever it is material to prove the state of a person's mind, or what was passing in it, and what were his intentions, there you may prove what he said, because that is the only means by which you can find out what his intentions were."

Accordingly the Supreme Court has repeatedly said in substance that:

"Great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more correct their judgment is likely to be. 'The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded on truth.'" Williamson v. U. S., 207 U. S., loc. cit. 451, 28 Sup. Ct. 163, 172, 52 L. Ed. 278.

This rule should apply as well in favor of the defendant as against him, especially in a criminal proceeding. If the government, in endeavoring to make out a case, may be permitted to indulge a wide range of latitude in the development of concomitant facts and circumstances to enable the jury to ascertain the state of the defendant's mind as illustrated by a given incident, it must obtain that the jury should be permitted to hear, not alone the facts and circumstances tending to inculpate the defendant, but also the correlative facts, acts, and declarations of the defendant which tend to his exculpation. It has often fallen under my observation, at the bar and on the bench (the propriety of which has scarcely been questioned), that where, in the investigation of the existence of an alleged fraudulent transaction of the defendant, the plaintiff or the prosecution put in evidence the declarations and acts of the defendant made during the time the claimed fraud was being perpetrated, the defendant may also put in evidence correlative, germane statements, made under like circumstances before the litigation arose, which tend to negative the truth of the claimed inculpatory statements.

In the present instance the government sought by I. D. Hull to show that he was representing the defendant Huntington in stating to old soldiers at Woodbine, Iowa, where said Clark lived, that they would not be required to live on the land; that it would be sufficient if they visited it once in every six months. Huntington testified that

he neither made nor authorized to be made such statements. Clark, residing in said town, to satisfy himself as to the truth of said representations, wrote to Huntington the letter of inquiry, in which he said:

"And now I want you to answer a few more questions. I was told before going up there that I did not have to live on the land, but only be on it every six months, and that was all the law required. Now then the oath I take says I must live on the land and make it my home to hold it. Now Mr. I. D. Hull says there is a way to get around that, but don't tell how it is. Now what I want you to tell me is how I am going to hold that land without living on it, for I am never going to live on it. Please help me to see the way out and oblige."

To this Huntington promptly replied, in which he said:

"You were misinformed when you were told that you did not have to live on your claim. It is supposed to become your residence after the first six months. Now a residence does not imply that you must be on the land every minute of the time, and absence for long periods for good causes will not impair your residence. But the government insists that it be your home from the end of the first six months until the time for final proof. The government looks at the intention of the homesteader, and will be more particular in regard to it than to the letter of the law."

The alleged conspiracy was then in operation, a continuing thing, and this statement was, therefore, in a sense a part of the res gestæ. State v. Gabriel, 88 Mo. 631. Is it possible to conceive that if Huntington, as the government claims, was seeking to procure entries by misrepresentations respecting the required occupancy of the premises, he would have written such a letter to Clark in the very town where the other soldiers lived? It was a contemporaneous act, a statement made by the defendant in response to direct inquiry, in contradiction of Hull's representations, to set the soldiers and himself right. Exclusion of this correspondence cannot be justified on the ground that, without the evidence of Clark that he received the letter, it was mere hearsay. Huntington testified that he signed and duly posted the letter. It is settled law that when a letter is so posted "it is presumed, from the known course of business in the Post Office Department, that it reached its destination at the regular time, and was received by the person to whom it was addressed." Rosenthal v. Walker, 111 U. S., loc. cit. 193, 4 Sup. Ct. 386, 28 L. Ed. 395; Dunlop v. United States, 165 U. S. 495, 17 Sup. Ct. 375, 41 L. Ed. 799.

It is equally a misconception to apply to this evidence the rule of post litem motam declarations. Even in that view "the mere possibility of a bias or desire to misrepresent is not sufficient" to exclude it. Doe v. Davis, 10 Q. B. 325; People v. Insurance Co., 25 Wend. (N. Y.) 215; Shields v. Boucher, 1 De G. & Sm. 40. Wigmore, in his treatise on Evidence (volume 3, par. 1732), very pertinently and sensibly observed on this topic:

"It is argued that the party must not be allowed to 'make evidence for himself.' But this objection applies equally to many classes of statements under the present exception, and is yet not thought of as fatal. Moreover, the notion of 'making'—that is, 'manufacturing'—evidence, assumes that the statements are false, which is to beg the whole question. Then it is further suggested that at any rate the accused, if guilty, may have falsely uttered these sentiments in order to furnish in advance evidence to exonerate him from a contemplated crime. But here the singular fallacy is committed of taking the possible

trickery of guilty persons as a ground for excluding evidence in favor of a person not yet proved guilty; in other words, the fundamental idea of the presumption of innocence is repudiated. We elaborate this presumption in painful and quibbling detail; we expend upon it pages of judicial rhetoric; we further maintain, with sentimental excess, the privilege against self-crimination; in short, we exhaust the resources of reasoning and strain the principles of common sense to protect an accused person against an assumption of guilt until the proof is irresistible; and yet, at the present point, we throw these fixed principles to the winds and make this presumption of guilt in the most violent form. Because (we say) this accused person might be guilty, and therefore might have contrived these false utterances, therefore we shall exclude them, although without this assumption they indicate feelings wholly inconsistent with guilt, and although, if he is innocent, their exclusion is a cruel deprivation of a most natural and effective sort of evidence."

The crux of the whole issue was and is, With what mind or intent was the defendant acting? The government was indulged to put in evidence, through the mouths of witnesses brought from Woodbine, the declarations of Hull as representing Huntington. Not only that, but the testimony of entrymen, not named in the indictment, as to what were their intentions, and what this and that person said to them, charged as participant in the conspiracy. And the court instructed touching this as follows:

"Some evidence has been given of transactions and conversations between some of those charged as conspirators with others than those named in the several counts of the indictment as having made homestead entries, relating to what are claimed to be similar transactions to those charged in the indictment. This evidence was admitted, and may be considered by you, not to show any other offenses than those alleged in the indictment, but only as bearing on the question of the intent or guilty knowledge of the parties accused by this indictment, as to the offenses alleged in this indictment."

Shall it be declared to be the law of the land that the government may pick out such witnesses as suits its purpose, from a given locality, to show the declarations of claimed agents of the defendant on the issue of criminal intent, and then bar the defendant from showing the contrary statement, made by himself to other entrymen of the same class who made entries under the same circumstances, and during the same period of the operation of the alleged conspiracy, bearing on the issue of intent? As already stated, the crucial issue on trial was whether or not Huntington authorized Hull to state what some of the witnesses called by the government testified Hull said to them. Was it not a fact, a circumstance to go to the jury, what Huntington, contemporaneously with the running of the alleged fraudulent transactions said in person to other like entrymen, tending to show as it did that such was not the authorized statement of Hull? What other or better corroborative circumstance could the defendant furnish of his own version given on the witness stand? It was for the jury, and not the court, to determine whether the letter written by Huntington to Clark and his statements made to the entrymen Smith, Card, and Van Slike, were in good faith, an honest expression of his mind. Danforth v. Streeter, 28 Vt. 491; Eagon v. Eagon, 60 Kan. 697, 57 Pac. 942. Quite pertinent to this question is the recent holding in Hibbard v. United States (C. C. A.) 172 Fed. 66, 70, 71.

On the merits the conviction of the defendant Hoyt is the most indefensible of all. It is not too much, in my opinion, to say that it rests almost entirely upon mere conjecture and suspicion, and not upon that affirmative proof the law exacts in criminal prosecutions. The evidence shows that Hoyt was a United States commissioner at Gordon, Neb. He was the only practical operator of a typewriter in the small village. He was connected with the Maverick Loan & Trust Company as vice president. The defendant Huntington was also connected therewith as an officer. The business of the company was the buying and selling of lands. The evidence was that said trust company had no connection with or interest in the matter of procuring entries under the homestead act, or in obtaining leases from such entrymen. Huntington, independent of Hoyt, long prior to the enactment of the Kinkaid act, had been engaged in obtaining from homesteaders leases and selling the same, and pursued that business under the Kinkaid act. The testimony of both Huntington and Hoyt was that Hoyt had no connection with or interest in that business of Huntington's; that he had but a very limited acquaintance with any of the other defendants in the indictment. His office was in the same building with Huntington, and, as he was the only typewriter and commissioner there, he had for some time prepared the declaratory statements or affidavits for persons making entries under the homestead act. As an accommodation to Huntington, when not officially or otherwise engaged, he did writing for him on his typewriter, for which he neither charged nor received any compensation other than the mutual accommodations between Huntington and himself. He was never interested in any leases taken or sold by Huntington. As a mere act of accommodation, on request of some of the parties, he assisted them in getting teams to go to see land by intending entrymen. To implicate Hoyt with Huntington, the prosecution relied upon a letter written by I. D. Hull to Huntington on September 29, 1904, which stated:

"That one Crow who came up with Hull on the 6th day of that month and filed on land had since died, and inquired as to what the heirs would have to do to prove up," etc.

On receipt of that letter Huntington applied to Hoyt for advice as to what was to be done, whereat he indorsed on the bottom of that letter in pencil the following:

"They will make proof when his time expires, same as he would had he lived. They do not have to do anything, only to see that the land is cultivated for their benefit and proper improvements made. This is all provided for, I believe, by the lease Crow made when he was here."

All this was a complete and satisfactory explanation of the testimony of some of the entrymen to the effect that their papers, etc., were prepared by Hoyt, and that Huntington was with Hoyt. To warrant the conviction of a party as a member of an alleged conspiracy, the evidence must show that he was cognizant of the existence of the fraudulent scheme as alleged; that he consciously became a party to it, whereby he became bound by every overt act done by any of the conspirators in furtherance of the criminal enterprise. There is

no sufficient evidence of any such knowledge or any such act on the part of Hoyt. The very utmost that could be tolerably conjectured as to him is that he knew Mr. Huntington was engaged in getting and selling leases obtained from entrymen. There is not a shadow of tangible evidence that he had any information or knowledge of any conspiracy between Huntington and the other defendants to obtain the title to any of this land by means of simulated entries under the homestead act. Everything done or said by Hoyt was perfectly consistent with his and Huntington's evidence as to the capacity in which he was acting in these transactions, rather than evidencing guilty knowledge or guilty conduct. The request for a directed verdict in his case should have been given.